THE STATE OF OHIO, APPELLANT, *v.* DUNN, APPELLEE.

[Cite as *State v. Dunn,* **131 Ohio St.3d 325, 2012-Ohio-1008.**]

*The community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement allows police officers to stop a person to render aid if they reasonably believe that there is an immediate need for their assistance to protect life or prevent serious injury.*

(No. 2011-0213—Submitted October 19, 2011—Decided March 15, 2012.)

APPEAL from the Court of Appeals for Montgomery County, No. 23884, 2010-Ohio-6340.

_____

SYLLABUS OF THE COURT

The community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement allows police officers to stop a person to render aid if they reasonably believe that there is an immediate need for their assistance to protect life or prevent serious injury.

_____

LUNDBERG STRATTON, J.

{¶ 1} Today this court must decide whether the community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement allows the police to stop a driver based on a dispatch that the driver is armed and plans to kill himself. Because we answer in the affirmative, we reverse the judgment of the court of appeals.

## I. Facts and Procedural History

{¶ 2} On March 27, 2008, Vandalia Police Officer Robert Brazel received a dispatch that there was a suicidal male driving a tow truck and that he was planning to kill himself when he arrived at 114 Helke Road in Vandalia. The

dispatcher gave the name of the driver, Richard Dunn, defendant-appellee, and indicated that he had a weapon. The dispatcher also noted that the vehicle was a "big rig" tow truck displaying the name Sandy's towing company.

{¶ 3}   Officer Brazel was familiar with the Helke Road address because he had seen a tow truck parked in front of the residence several times during his patrol route. Less than two minutes after he heard the dispatch, Brazel saw the tow truck, and it was approximately two miles from the Helke address. Brazel followed it until another officer arrived to assist him, and then the two officers signaled for Dunn to pull over.

{¶ 4}   After stopping the truck, Dunn, who was crying, got out of the vehicle and put his hands up. The officers saw that Dunn was holding a cell phone, but they did not see any weapon. Because they were dealing with an allegedly suicidal person, they handcuffed Dunn for their safety and his. The officers did not find any weapons on Dunn other than a small pocketknife. Dunn was placed in Brazel's cruiser.

{¶ 5}   Brazel testified that as he was walking Dunn to his police cruiser, Dunn stated: "[I]t's in the glove box." Brazel asked him if he was referring to a gun, and Dunn said yes. The other officer checked the glove compartment and found a loaded gun.

{¶ 6}   After the weapon was secured, Brazel spoke with Dunn about the events leading up to the stop. Dunn told the officer that the week before, he had had problems with his soon-to-be ex-wife and had been taken to a hospital for a mental-health evaluation. Dunn informed the officer that he had intended to shoot himself when he got to the place where he was to drop off the semi that he was towing. Brazel explained to Dunn that he could be involuntary committed or he could go to the hospital voluntarily. Ultimately, Brazel drove Dunn to the hospital in his patrol car.

**{¶ 7}** On August 10, 2009, Dunn was indicted on one count of improper handling of a firearm in a motor vehicle, R.C. 2923.16(B). On October 2, 2009, Dunn filed a motion to suppress, contending that the traffic stop violated the Fourth Amendment and that the officers had improperly interrogated him without informing him of his *Miranda* rights. Therefore, Dunn asked that all evidence resulting from the stop and his statements be suppressed, including the gun found in the glove compartment. Brazel was the only witness called at the suppression hearing, and the testimony focused on the facts surrounding the stop. Brazel testified that he had not observed Dunn commit any traffic violations or violations of any other laws while he followed him, and he admitted that the officers had not provided Dunn with *Miranda* warnings.

**{¶ 8}** The trial court overruled the motion to suppress, holding that the stop was a " 'legitimate response to an emergency situation,' " quoting *State v. Stubbs*, 2d Dist. No. CA 16907, 1998 WL 677510, *3 (Oct. 2, 1998), and was therefore not an unreasonable seizure under the Fourth Amendment. The court also held that Dunn's statements and the evidence obtained from them should not be suppressed, because the police officers had not engaged in custodial interrogation but rather, Dunn's statements were spontaneous and unsolicited.

**{¶ 9}** On December 30, 2009, the court held a change-of-plea hearing at which Dunn pleaded no contest to the single count in the indictment. Dunn was sentenced to five years of supervised probation and was ordered to attend counseling and pay court costs. The Court of Appeals for Montgomery County reversed the judgment of the trial court, vacated the conviction, deemed Dunn's plea of no contest withdrawn, and granted the motion to suppress.

**{¶ 10}** The case is now before this court upon our acceptance of the state's discretionary appeal. *State v. Dunn,* 128 Ohio St.3d 1458, 2011-Ohio-1829, 945 N.E.2d 522.

## II. Analysis

{¶ 11} We begin by noting the irony that Dunn, who was suicidal when he was stopped by the police, now contends that the police should not have stopped his vehicle to render aid. If the police had not stopped Dunn, he may have harmed himself. And if the police had not acted and Dunn had harmed or killed himself, Dunn or his estate could have filed a civil lawsuit against the police for failure to respond to an emergency. Such is the balancing act of Fourth Amendment law.

{¶ 12} In analyzing the validity of the stop, the court of appeals relied on *Maumee v. Weisner*, 87 Ohio St.3d 295, 720 N.E.2d 507 (1999), and held that the state had not demonstrated that the dispatcher had a reasonable basis for issuing the dispatch that caused the officers to stop Dunn's truck. The court of appeals appears to have determined that the officers were not authorized to stop Dunn unless there was evidence from which the dispatcher could have concluded that the information supplied to him or her had sufficient indicia of reliability. This was not the proper analysis to employ. As noted by the dissenting judge below, the evidentiary requirement that *Weisner* imposes on the state in a suppression hearing applies only to an "investigative stop" authorized by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which entails seizure of a person to investigate a reasonable suspicion of criminal activity. Since this was not a *Terry* stop, the court of appeals erred in using this analysis.

### A. Fourth Amendment

{¶ 13} The Fourth Amendment to the United States Constitution provides:

{¶ 14} "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

{¶ 15} There are a number of exceptions to the Fourth Amendment warrant requirement, including the one applicable to this case, the community-caretaking exception, which courts sometimes refer to as the "emergency-aid exception" or "exigent-circumstance exception."

{¶ 16} The community-caretaking exception was first addressed by the United States Supreme Court in *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). Dombrowski, an off-duty Chicago police officer, was arrested by police in Wisconsin on a charge of drunk driving following a one-car accident in which Dombrowski's rental car was heavily damaged. *Id.* at 435-436. The car was towed from the scene to a privately owned garage, and a few hours later, one of the arresting officers searched Dombrowski's vehicle without a warrant, looking for his service revolver, which the officer believed to be in his vehicle. *Id.* at 436-437. In the trunk of Dombrowski's vehicle, the officer found evidence linking him to a murder, a crime for which he was eventually convicted. *Id*. at 437, 439. Ultimately, the court concluded that because the trunk of the vehicle was vulnerable to intrusion by vandals and the officer reasonably believed that the trunk contained a gun, the search was not unreasonable within the meaning of the Fourth Amendment. *Id*. at 448.

{¶ 17} The court explained that local law-enforcement officers "frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441. As the court noted in *Dombrowski*, "[t]he ultimate standard set forth in the Fourth Amendment is reasonableness." *Id.* at 439. Thus, the Fourth Amendment protects citizens from only *unreasonable* government searches and seizures. *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

**{¶ 18}** The United States Supreme Court further elaborated on the community-caretaking exception to the Fourth Amendment warrant requirement in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). "We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Id*. at 392. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir.1963).

**{¶ 19}** The Supreme Court has also referred to this exception as the "emergency-aid exception." For example, in *Michigan v. Fisher*, ___ U.S. ___, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009), the court upheld an officer's warrantless entry into the defendant's residence as reasonable when the police officers who were responding to a call regarding a disturbance observed a tumultuous situation when they arrived at the home, including blood on a damaged vehicle parked in the driveway and witnesses reporting that the defendant was "going crazy" inside. *Id.* at ___, 130 S.Ct. at 547. The *Fisher* court noted that "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Id.* at ___, 130 S.Ct. at 549. Rather, "[a]n action is 'reasonable' under the Fourth amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' " (Emphasis added in *Stuart.*) *Brigham City v. Stuart*, 547 U.S. 398, 404, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006), quoting *Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978).

**{¶ 20}** Because police officers are duty-bound to provide emergency services to those who are in danger of physical harm, I *American Bar Assn. Standards for Criminal Justice*, Section 1-2.2 at 1-31 (2d Ed.1980), courts must

frequently consider the reasonableness of an officer's actions in situations, such as the one at bar, where a person's life is in jeopardy. In *State v. Applegate*, 68 Ohio St.3d 348, 626 N.E.2d 942 (1994), this court upheld a warrantless entry into a residence by police officers who, while responding to a report of domestic violence, heard sounds coming from inside the residence indicative of violence. Although we did not use the term "community caretaking," but rather "exigent circumstances," we held that the warrantless entry was certainly justified by the officers' reasonable belief that entering the residence was necessary to investigate an emergency threatening life and limb. *Id.* at 349-350. In so holding, the court noted: " '[T]he business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation of the judicial process.' " (Emphasis added in *Applegate*.) *Applegate* at 350, quoting *Wayne*, 318 F.2d at 212.

{¶ 21} Thus, courts recognize that a community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement is necessary to allow police to respond to emergency situations where life or limb is in jeopardy. For example, in *Turner v. State*, 645 So.2d 444 (Fla.1994), the Florida Supreme Court upheld officers' warrantless entry into a motel room when the defendant had opened the door after the officers knocked, walked from the door to a bed, leaving the door ajar, and pulled out a gun and pointed it at his head. *Id.* at 447. Further, in *Seibert v. State*, 923 So.2d 460, 470-471 (Fla.2006), the Florida Supreme Court held that the warrantless entry and search of an apartment in response to a call indicating that a person in the apartment had threatened to kill himself was lawful because of exigent circumstances indicating the need for help. And the Eighth Circuit Court of Appeals upheld a warrantless entry into a man's bedroom when his wife reported to the police that he was suicidal and had locked himself in the bedroom with a gun. *United States v. Uscanga-Ramirez*, 475 F.3d 1024 (8th Cir.2007). Finally, in *Goldsmith v. Snohomish Cty.*, 558 F.Supp.2d 1140, 1152

7

(W.D.Wash. 2008), the court held that the community-caretaking exception to the warrant requirement applied to officers' temporary arrest of a violent injured man for the sole purpose of enabling paramedics to render necessary medical aid. *See also Ziegler v. Aukerman,* 512 F.3d 777, 785-786 (6th Cir.2008); *State v. Oliver*, 91 Ohio App.3d 607, 610, 632 N.E.2d 1382 (9th Dist.1993).

{¶ 22} Thus, we hold that the community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement allows police officers to stop a person to render aid if they reasonably believe that there is an immediate need for their assistance to protect life or prevent serious injury.

{¶ 23} In this case, officers received a dispatch regarding an allegedly armed and suicidal person with an imminent plan to kill himself upon reaching a certain destination. Given that stopping a person on the street is "considerably less intrusive than police entry into the home itself," *Illinois v. McArthur,* 531 U.S. 326, 336, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001), the officers' effecting a traffic stop to prevent Dunn from harming himself was reasonable under the Fourth Amendment. Thus, the community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement allows police officers to stop a driver based on a dispatch that the driver is armed and plans to kill himself.

*B. Voluntary Statement*

{¶ 24} As the trial court below held, the requirement that police officers administer *Miranda* warnings applies only when a suspect is subjected to both custody and interrogation. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Here, Dunn emerged from the vehicle on his own accord and almost immediately stated that a gun was in the glove compartment. An unsolicited and spontaneous statement such as the one made by Dunn in this case is not the product of an interrogation, so *Miranda* does not apply. *See Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

### III. Conclusion

{¶ 25} As Chief Justice Warren Burger once said, " ' "[t]he policeman on the beat, or in the patrol car, makes more decisions and exercises broader discretion affecting the daily lives of people, every day and to a greater extent, in many respects, than a judge will ordinarily exercise in a week * * *." ' " Excerpted from an FBI Academy graduation address by then Chief Justice of the United States Supreme Court Warren E. Burger. Dimino, *Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness,* 66 Wash. & Lee L.Rev. 1485, 1527 (2009), quoting Abadinsky, *Discretionary Justice* 15 (1984), quoting Carlton, *A Crime Agenda for North Carolina* 26-27 (1978).

{¶ 26} The community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement allows a law-enforcement officer with objectively reasonable grounds to believe that there is an immediate need for his or her assistance to protect life or prevent serious injury to effect a community-caretaking/emergency-aid stop. Thus, the officers in this case were authorized to stop Dunn based on the dispatch that Dunn was armed and planned to kill himself. Accordingly, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court.

Judgment reversed.

O'CONNOR, C.J., and O'DONNELL, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

PFEIFER, J., dissents.

_____

**LANZINGER, J., concurring.**

{¶ 27} I concur. As the majority opinion makes clear, the rule requiring evidence of a telephone tip's reliability is confined to investigatory stops. *Maumee v. Weisner*, 87 Ohio St.3d 295, 720 N.E.2d 507 (1999). And in

specifically holding that the community-caretaking/emergency-aid exception exists, we clarify that police may approach citizens without a warrant in circumstances such as Dunn's.

{¶ 28} What is troublesome here is that the state indicted Dunn for the crime of improper handling of a firearm in a motor vehicle 16 months after the police prevented his suicide. One wonders if it was reasonable for the state to prosecute Dunn under these circumstances after more than a year had passed. Nevertheless, a motion to suppress puts at issue the actions of police rather than prosecutors. Because the officers in this case acted reasonably and responsibly, I agree that there was no Fourth Amendment violation and that the court of appeals' judgment should be reversed.

O'CONNOR, C.J., and MCGEE BROWN, J., concur in the foregoing opinion.

_____

**PFEIFER, J., dissenting.**

{¶ 29} Whether this case should have been prosecuted at all is questionable. But it was. It could have been properly prosecuted. But it wasn't. This case is before us because of the prosecution's simple failure to meet its burden in the suppression hearing of proving that the traffic stop leading to the charge against Dunn was reasonable. The prosecution's failure to meet its burden comes from its lack of any attempt to show that the telephone tip that led to the dispatch had sufficient indicia of reliability. This case should stand for the simple proposition that when criminal charges evolve from a traffic stop that is based entirely upon a citizen's call to a dispatcher, the state must prove that the citizen's call presented sufficient indicia of reliability to justify the stop.

I

{¶ 30} This is a case about a telephone tip. Officer Brazel stopped Dunn based solely on a telephone tip that Dunn was suicidal and in imminent danger. In *Maumee v. Weisner*, 87 Ohio St.3d 295, 720 N.E.2d 507 (1999), this court

addressed whether a telephone tip can, by itself, create reasonable suspicion justifying an investigative stop. This court held that a telephone tip can, standing alone, create reasonable suspicion justifying an investigative stop where the tip has sufficient indicia of reliability: "Where an officer making an investigative stop *relies solely upon a dispatch,* the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity." (Emphasis sic.) *Weisner*, at paragraph one of the syllabus.

**{¶ 31}** But the majority writes that "the evidentiary requirement that *Weisner* imposes on the state in a suppression hearing applies only to an 'investigative stop' authorized by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which entails seizure of a person to investigate a reasonable suspicion of criminal activity." Majority opinion at ¶ 12. First, although it did involve an arrest for driving while intoxicated, *Weisner* does not limit its holding to traffic stops involving suspicion of criminal behavior. Second, although the court stated in *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid," courts cannot take on faith that an emergency existed. "[A] warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation,' *Terry v. Ohio*, 392 U.S., at 25-26, [88 S.Ct. at 1882, 20 L.Ed.2d 889,] and it simply cannot be contended that [the] search was justified by any emergency threatening life or limb." *Mincey* at 393. That is, as with any search or seizure, a stop based upon a suspected emergency situation must be objectively reasonable based on the totality of the circumstances. At heart, *Weisner* is about whether a stop based solely upon a telephone tip can be objectively reasonable, and there is no reason that *Weisner*'s holding should not include traffic stops made for the purpose of investigating an emergency situation.

**{¶ 32}** The stop of Dunn had all the earmarks of an investigative stop. In the context of an investigatory stop of an automobile, stopping a car and detaining its occupants constitutes a seizure. *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Officer Brazel testified that he had turned on his overhead lights and siren to alert Dunn to pull to the side of the road. He and the township officer also responding "blocked the roadway and lit the area." When Dunn emerged from his vehicle, Brazel told him to put his hands in the air, and he eventually handcuffed him. The video recording of the stop was labeled by the police as a traffic stop.

**{¶ 33}** Even if there were a requirement that a suspicion of criminal activity is necessary to gain the protection of *Weisner*, the evidence demonstrates that Brazel did suspect criminal activity by Dunn, i.e., the possession of a gun in his vehicle. Dunn was eventually charged with a violation of R.C. 2923.16(B), which states, "No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle." Brazel heard a dispatch that a male driving a tow truck was planning to kill himself when he arrived at a specific residence. At the suppression hearing, he was asked whether there was any information dispatched regarding a weapon. He responded affirmatively: "Yes, advised that he was going to kill himself. But, I don't remember if they said there was a—a firearm in the vehicle or anything like that. But, there was some indication of a weapon with the dispatch."

**{¶ 34}** Brazel's behavior at the stop indicated that he feared Dunn had a weapon. He called for backup. He approached Dunn's vehicle with his own weapon drawn, ordering Dunn to put his hands up. He testified that he had seen a cell phone in Dunn's hand but "couldn't see the obvious other weapons on him at that time." He then handcuffed Dunn for the officers' safety because he "wanted to check him for weapons." As Brazel led him to his cruiser ("for his safety and

our safety," according to Brazel), Dunn told him, "[I]t's in the glovebox." Brazel had no doubt as to what Dunn was referring: "I said are you referring to the gun." Not *a* gun, *the* gun. Brazel knew a gun was involved.

{¶ 35} Brazel stopped Dunn because the dispatch indicated that Dunn had a weapon in his vehicle that could cause his imminent death. Dunn ended up being charged with "hav[ing] a loaded firearm in a motor vehicle in such a manner that the firearm [was] accessible to the operator or any passenger without leaving the vehicle." The allegation in the call justifying the stop—that he possessed a weapon in his vehicle—became the very basis of the charge. Thus, even assuming arguendo that *Weisner* applies only to situations entailing "seizure of a person to investigate a reasonable suspicion of criminal activity," as the majority holds at ¶ 12, the facts of this case demonstrate that there was sufficient suspicion of criminal activity in this case to trigger the protections of *Weisner*.

## II

{¶ 36} The majority wants to make this a case only about exigent circumstances. Certainly, whether it is called the community-caretaking exception or the emergency-aid exception, there is an exception to the Fourth Amendment's warrant requirement in cases where police are responding to emergency situations. Regarding its line of cases addressing that issue, the United States Supreme Court recently wrote, "A reasonable police officer could read these decisions to mean that the Fourth Amendment permits an officer to enter a residence if the officer has a reasonable basis for concluding that there is an imminent threat of violence." *Ryburn v. Huff*, 565 U.S. ___, ___, 132 S.Ct. 987, 990, 181 L.Ed.2d 966 (2012).

{¶ 37} Of course it is reasonable to make a traffic stop in order to prevent a suicide; but if the state brings criminal charges based upon that stop, it still must prove that the officer making the stop had a reasonable basis to believe that the driver was suicidal. Where the stop is based entirely on an informant's call to a

police dispatcher, the reasonableness of the stop must be based upon the reliability of the tip that generated the police dispatch.

{¶ 38} The majority cites many cases in which courts found that officers had a reasonable basis to conduct a warrantless entry, but none of those cases involve a telephone tip as the sole reason supporting the entry. In every case cited by the majority, the police officers in question also relied on their own observations.

{¶ 39} In *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), police opened and searched the trunk of the defendant's heavily damaged vehicle after they had had it towed to a privately owned garage. Because the searching officer knew the defendant to be an off-duty Chicago police officer and believed that Chicago police officers were required to keep their service revolver nearby at all times, he searched the trunk to retrieve the service revolver. The incriminating evidence he found—bloody clothing and other items—was not what he was originally looking for. The search of the trunk was not based upon an anonymous telephone report—it was based upon normal operating procedure and upon the officer's belief that he was retrieving a revolver from an unguarded location.

{¶ 40} In *Michigan v. Fisher*, ___ U.S. ___, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009), police responded to a disturbance call. Upon arriving at the residence in question, they saw blood on a damaged vehicle parked outside, as well as on a door of the house. They spoke to witnesses who told them the defendant was "going crazy" inside the house. *Id.* at ___, 130 S.Ct. at 547, 175 L.Ed.2d 410. Through a window, the officers could see the defendant, Jeremy Fisher, inside the house, screaming and throwing things. The back door was locked, and a couch had been placed to block the front door. The police entered the home, and the defendant pointed a rifle at one of the officers. Fisher was later charged with

14

crimes related to the firearm. Again, police had entered the home based in part upon the officers' own observations.

{¶ 41} Likewise, in *Brigham City v. Stuart*, 547 U.S. 398, 404, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006), police entered a home only after they had seen— through a window—a fight break out inside. After entering the house, they made arrests for intoxication and contributing to the delinquency of a minor.

{¶ 42} In *State v. Applegate*, 68 Ohio St.3d 348, 626 N.E.2d 942 (1994), police entered a residence after they had personally heard sounds coming from inside the house indicative of violence. When the defendant refused to put down a whiskey bottle, a scuffle ensued. The defendant was arrested for disorderly conduct, and while he was being searched, a baggie of cocaine was found in his pocket.

{¶ 43} In cases cited by the majority involving threatened suicide, the warrantless entrances also came as the result of personal observations by the officers involved. In *Turner v. State*, 645 So.2d 444 (Fla.1994), officers made warrantless entries into a hotel room when they saw the defendant holding a gun to his head. They then encountered evidence of murders that the defendant had committed.

{¶ 44} In *Seibert v. State*, 923 So.2d 460, 470-471 (Fla.2006), police responded to a 9-1-1 call regarding a suicidal person. The call had come from the person's roommate. When they arrived at the residence, police spoke to the roommate who had placed the 9-1-1 call and were told that the defendant was inside the residence and was suicidal. They entered the defendant's residence after he cracked open the door, and while inside, they spotted a severed foot.

{¶ 45} In *United States v. Uscanga-Ramirez*, 475 F.3d 1024 (8th Cir.2007), the defendant's wife consented to the police officers' entry into the residence, and she told them that her husband was armed and despondent.

**{¶ 46}** In all the above cases relied upon by the majority, at least some of the facts justifying the officers' warrantless entry into the defendant's property were gleaned from the officers' own investigation. Thus, the present case differs from all the cased cited by the majority. Officer Brazel's stop was not based on any personal observation. It was based only upon a police dispatch. And a dispatch alone can form a reasonable basis for a valid stop only when there is some evidence of the reliability of the information given to the dispatcher.

III

**{¶ 47}** A determination of the reasonableness of a stop under *Weisner* "involves a consideration of 'the totality of the circumstances.' *United States v. Cortez* (1981), 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 628-629. Under this analysis, 'both the content of information possessed by police and its degree of reliability' are relevant to the court's determination. *Alabama v. White* (1990), 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, 309." *Weisner*, 87 Ohio St.3d at 299, 720 N.E.2d 507.

**{¶ 48}** Where the only information possessed by police prior to the stop is from an informant's tip, "the determination of reasonable suspicion will be limited to an examination of the weight and reliability due that tip," specifically, "whether the tip itself has sufficient indicia of reliability to justify the investigative stop." *Id*. The most important factors in determining the reliability of an informant's report are "the informant's veracity, reliability, and basis of knowledge." *Id*., citing *White* at 328.

**{¶ 49}** In *Weisner*, this court did not set a high bar on the type of evidence needed to prove that a call to a dispatcher presents sufficient indicia of reliability to justify a traffic stop. The state "must present evidence of the facts known to the dispatcher in these situations." *Weisner* at 298. The testimony of the informant who made the call is not required. The testimony of the dispatcher is not required. In *Weisner*, this court held that testimony from the arresting officer

about the facts that precipitated the dispatch as relayed to him by the dispatcher was sufficient. This court was even willing to allow that testimony as support even though the dispatcher might not have told the officer all the facts that precipitated the dispatch until after the stop was completed. *Id*. at fn. 1.

{¶ 50} Here, the state introduced no evidence regarding the facts known to the dispatcher regarding the caller. There was no way, then, for the trial court to judge the reliability of the information the caller gave to the dispatcher. Thus, the state failed to prove that the stop leading to Dunn's indictment was reasonable.

IV

{¶ 51} Great police work does not have to result in a conviction. Whether they are assisting stranded motorists, helping lost children find their parents, or calming potentially dangerous situations, police officers serve their communities daily performing good deeds that do not show up on police blotters. In this case, Officer Brazel did exemplary work. He interrupted Dunn's potential suicide. He defused the situation with no injury to himself or Dunn. He did not arrest Dunn; instead, he took him to a local hospital to get him the mental-health help he needed. Why did Brazel drive Dunn himself? Because Dunn was upset over having been billed for an earlier trip to the hospital by ambulance. This was a mission of mercy performed with impeccable professionalism by a well-trained police officer.

{¶ 52} But the prosecutor decided to charge Dunn with a crime, and we therefore must consider whether the state properly proved the case against him. At the suppression hearing, the state failed to prove the reliability of its informant's tip in a situation where the informant's tip served as the entire basis for the stop leading to Dunn's indictment. The court of appeals was therefore correct in reversing the conviction. Accordingly, I dissent.

_____

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Carley J. Ingram and Timothy J. Cole, Assistant Prosecuting Attorneys, for appellant.

Gary C. Schaengold, for appellee.

Michael DeWine, Attorney General, Alexandra T. Schimmer, Solicitor General, and Thaddeus H. Driscoll, Assistant Attorney General, urging reversal on behalf of amicus curiae Ohio Attorney General.

Timothy Young, Public Defender, and Jeremy J. Masters, Assistant Public Defender, urging affirmance on behalf of amicus curiae Ohio Public Defender.

_____